**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 25-175** |
| **ISAIAH SMITH** | : | |

**UNITED STATES' SENTENCING MEMORANDUM**

Defendant Isaiah Smith stands before this Court for sentencing for his possession of multiple video recordings of his sexual molestation and abuse of two tiny, prepubescent children on multiple occasions over more than a year's time. The defendant maintained these horrific videos across two cell phones and in his cloud account for months as he continued to sexually abuse his young victims. The defendant's child exploitation crimes are so serious that his sentencing Guideline range calls for 360 months to life imprisonment, which is limited by the 20-year statutory maximum for his charge. Based on the arguments set forth below, the Government seeks the statutory maximum term of incarceration, followed by lifetime supervised release, and requests that his sentence be run consecutively to the sentence he is currently serving on his Philadelphia County conviction.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025). At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave

meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

## I.      **BACKGROUND**

On April 24, 2025, a federal grand jury in the Eastern District of Pennsylvania returned a one-count Indictment charging Isaiah Smith with possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). On January 21, 2026, the defendant entered an open plea of guilty to the indictment. No agreement was reached with the government as to the sentence to be imposed.

The defendant now stands before this Court for sentencing, which is scheduled for June 30, 2026.

## II.    FACTUAL BACKGROUND[1]

On January 16, 2025, Philadelphia Police Department responded to a call on Womrath Street in Philadelphia, Pennsylvania. They were met by the stepfather of the six-year-old child victim who reported that a few hours before, on the night of January 15, 2025, defendant Isaiah Smith had been caught in the act of sexually assaulting the victim as he inserted his penis in the child's mouth while she was sleeping on the couch. The father advised that the defendant was a friend of his stepson's and had been living with them in their home. His stepson walked in on the sexual assault, confronted the defendant, and the defendant then fled the residence.

The victim's family reported to the Philadelphia Police Department's Special Victims Unit ("PPD-SVU") to make formal statements, and during the interview process, turned over to police the cell phone that belonged to the defendant. The stepson advised PPD-SVU that he accessed the contents of the phone using the defendant's passcode, and found nude photos of defendant, as well as two videos of the defendant inserting his penis into his sister's mouth. In addition to videos depicting the oral rape of his sister, he also found two additional videos of the defendant touching this child with his penis between her thighs and on her buttocks.

The defendant was arrested by PPD-SVU and charged with multiple counts of sexual abuse of the six-year-old child victim, beginning when the child was just five years old. The case was then referred to the Federal Bureau of Investigation. As part of their investigation,

---

1 The facts cited herein are taken from the Government's Change of Plea Memorandum, which was filed at the time of the entry of the defendant's guilty plea and to which the defendant stipulated. These same facts were adopted in the Presentence Report ("PSR"), to which the defendant has not lodged any substantive factual objection.

3

federal search warrants were obtained for the defendant's iPhone XR cellular phone and the related iCloud account associated with that phone. The review yielded the following evidence:

***iPhone XR cellular phone***

(A)    <u>Minor Victim 1</u> - A total of six videos taken on three different days, all of which depict the sexual abuse of the same child victim, who was just five years old at the time she was sexually assaulted by the defendant in these videos. It should be noted that these recordings of his abuse date back more than nine months before he was caught in the act of again assaulting this same child and arrested by Philadelphia Police in January 2025. The videos are described as follows:

(1)    IMG_3513.mov – created on April 12, 2024, at 10:45 p.m. The video is six seconds in length and depicts the defendant wearing a zipped grey jacket and inserting his penis into the child's mouth while she is sleeping on a bed. She is wearing a white shirt and has an orange bow in her hair.

(2)    cplARM91Ma9maL7+mgZrb_M_nAOcihy.mov (exact copy of above IMG_3513 video). This file was cached, with a created date of April 12, 2024, meaning that it was viewed on that date and the phone created an exact copy of what was viewed.

(3)    3aca79aab7d04672b3cb33412e7e3cf0.mov – created on May 8, 2024, at 8:49 p.m. This four second video depicts the defendant wearing a white shirt and touching the child victim with his penis while she is

laying on a couch. His penis appears to touch her upper leg and clothed buttocks.

(4)    7a6138d3d3414d03b26d587aa935f50c.mov – created on May 8, 2024, at 8:51 p.m. This 23 second video depicts the defendant touching the child's buttocks with his penis while she is laying on a couch. The defendant moved the child's clothes so that he could access and video record her genitals.

(5)    IMG_3794.mov – created May 15, 2024, at 10:09 p.m. This 5 second video depicts the defendant shirtless and wearing red shorts. He inserts his penis into the child's mouth while she lay sleeping on a couch.

(6)    IMG_3797.mov – created May 15, 2024, at 10:11 p.m. This video is 28 seconds in length and shows the defendant now wearing a blue shirt and the same red shorts, inserting his penis into the victim's mouth as she lay sleeping on the couch.

(B)    <u>Minor Victim 2</u> - A thumbnail preview image marked IMG_2465 was located on the phone in the Photo Gallery. The thumbnail image depicted the defendant's arm and the back of Minor Victim 2. The thumbnail contained an approximate time length of 2 minutes and 36 seconds. The metadata associated with the video contained an original created date of December 28, 2023, and a last accessed date of November 8, 2024. The full video (bearing the same file name, IMG_2465) was later recovered from the defendant's online iCloud account (see below).

(C)    <u>Searches conducted</u> – The following internet searches (relative to this

5

investigation) were conducted on this phone:

- 12/24/2024: how to see backed up photos on iCloud

- 12/24/2024: how to see every picture youve ever took on iphone

- 1/8/2025: fucking my real sister

(D)    <u>User Attribution</u> – The following evidence was found during the forensic examination which connects the defendant to his ownership and use of this phone:

- Email - multiple emails addressed to "ISAIAH SMITH."

- Photos - Numerous photos of the defendant were located on the phone, to include selfie-style photos, photos of the defendant taking photos of himself in mirrors while holding the phone, and photos of the defendant with his friends and family.

- Multiple user accounts in the defendant's true name and nickname

***Apple iCloud Online Storage Account***

On February 4, 2025, a federal search warrant (25-249-M) was obtained to search the defendant's Apple iCloud storage account, which was connected to his iPhone XR. The review of the contents revealed evidence linking the defendant to the account, including numerous self-taken images of the defendant by himself and with friends and family members, images of the defendant's GPS ankle monitor and Electronic Monitoring Unit business card, a selfie-image of the defendant standing in the mirror photographing himself with an iPhone 12 mini phone (the same camera that was used to record his sexual abuse of both minor children), text messages addressed to and authored by the defendant, and other online accounts in the defendant's true

6

name.

In addition to the attribution evidence linking the defendant to this storage account, the review also uncovered the full video of the defendant's sexual assault of the second victim, Minor Victim 2, who was just 3 years old at the time of the abuse. At the time of the abuse this child had been diagnosed with Autism Spectrum Disorder ("ASD") and was non-verbal. The video is 2 minutes and 35 seconds in length and bears a created date of December 28, 2023. The video was recorded with the same phone that was used to record the defendant's abuse of Minor Victim 1. At the start of the video the defendant can be seen repositioning the phone multiple times to obtain the desired angle. He then sits in a leather chair with his penis exposed and placed Minor Victim 2 on top of his lap. The child's pants are pulled down and he is wearing a diaper. The child is watching television. Within seconds the defendant picked up the child around the waist and held the child over his penis. He pulled the child's diaper to the side and then inserted his penis between the child's buttocks. As the assault continued, the defendant stood up from the chair, still holding the child, and placed the victim face down on the chair. The defendant then changed position, kneeling on the ground, and again inserted his penis in between the child's buttocks as the child remained face down on the chair. The defendant can be seen picking up the camera and zooming in on his penis between the child's buttocks. The camera is repositioned while the defendant masturbates between the child's buttocks. Smith is heard breathing heavily and then is seen ejaculating onto the child's buttocks. Of significance, though the child cannot speak, at different points during the abuse he can be heard making grunting/guttural sounds.

7

It should be noted that following this assault, the child's mother reported that the victim began ripping out his hair, scratching himself, and had trouble sleeping at night. She took photographs of the child at the time to memorialize his behavior. His mother thought the behavior was related to his ASD and placed him into therapy. His mother advised that her son had never displayed this type of behavior before his contact with the defendant.

## III.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentences

The maximum sentence that may be imposed is as follows:

**Possession of Child Pornography, 18 U.S.C. § 2252(a)(4)(B), (b)(2)**
20 years' incarceration,[2] a minimum 5 years up to a lifetime of supervised release, a $250,000 fine, a $100 special assessment, mandatory restitution of at least $3,000 per victim pursuant to 18 U.S.C. § 2259, and if found to be non-indigent, an additional mandatory $5,000 special assessment must be imposed pursuant to 18 U.S.C. § 3014, and another special assessment of up to $17,000 pursuant to 18 U.S.C. § 2259A(a)(2).

### B.    Sentencing Guidelines Calculation by the U.S. Probation Department

The Probation Office correctly calculated the defendant's advisory Guideline range at 360 months to life imprisonment, limited by the statutory maximum of 240 months' incarceration. *See* PSR ¶ 74. The defendant filed numerous objections to the PSR, all of which were denied by the United States Probation Office. He renews these same objections before the Court. For the reasons outlined below, the Government submits that the United States Probation Office's calculations are proper and the defendant's arguments should be denied.

---

2 The statutory maximum penalty for this offense is increased from 10 years to 20 years' incarceration because the defendant's collection depicts his abuse of prepubescent children under the age of 12 years. *See* 18 U.S.C. § 2252(b)(2).

### C.     <u>Defendant's Objections to the Guideline Calculations</u>

#### i.     *<u>The Cross Reference to the Manufacturing Guideline Applies</u>*

Defendant objects to the use of the cross-reference in USSG § 2G2.2(c), which provides that the Guidelines in § 2G2.1 (manufacture of child pornography) are to be used instead of § 2G2.2 (possession of child pornography), when the possession offense "involved" the defendant's manufacture of child pornography, so long as the resulting offense level is greater than that determined under § 2G2.2. Application Note 7 provides guidance for the application of this cross-reference, advising that "[t]he cross reference in subsection (c)(1) is to be construed broadly and includes all instances where the offense involved" the use of a minor to manufacture child pornography.

In this case, the videos the defendant possessed depicted his sexual abuse and molestation of two minor children which he videorecorded himself and continued to possess at the time of his arrest. His possession of these most vile recordings only arose because he manufactured them – and thus, his possession of them most certainly "involved" the use of a minor to manufacture child pornography. Defendant's argument should be denied.

#### a.    *The Juvenile Justice Act is Inapplicable*

He first argues that the application of the cross-reference to Section 2G2.1 somehow implicates and violates the Juvenile Justice Act, because the defendant was 17 years of age at the time he manufactured the images. He incorrectly asserts that this Court cannot consider the criminal acts that were committed by the defendant when he was a juvenile to calculate his Guideline range – without a single citation that stands for that proposition. Instead, he cites to the

Oxford English Dictionary and attaches a 22-page excerpt listing the history of the word "proceed" dating back to the 1300's in support of his erroneous proposition that the Government is "proceeding" against the defendant in violation of the Juvenile Justice Act by using his juvenile conduct in the calculation of his sentencing Guidelines. *See* Def. Br. at 10-12 and Exhibit 4.

His recitation of the Juvenile Justice Act and all its provisions have no bearing whatsoever on this sentencing proceeding, as **the defendant is not charged with any act that he committed while he was a juvenile**. The use of information or criminal acts committed by the defendant in an adult proceeding is in no way prohibited. The cross reference in USSG that permits the usage of Section 2G2.1 Guidelines is clear – if the present offense involved causing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct (manufacture of child pornography), then Section 2G2.1 is to be used. *See* USSG § 2G2.2(c). The Guidelines do not require that the conduct rise to the level of a conviction; nor do they require that the Court consider only "adult" criminal acts. Indeed, the plain language of the cross-reference states that for it to be applicable the crime at issue must have "involved" the manufacture of child pornography. Significantly, the Court is directed to construe the term "involved" broadly - and include **all** instances where the offense involved the manufacture of child pornography. *Id.*; *see also* App.Note 7. His argument on this point is misplaced and should be denied.

### b. The Cross Reference is Properly Applied

The defendant would have this Court adopt the non-sensical position that his possession of these videos in no way "involved" the manufacture of child pornography. He makes a lengthy and convoluted argument that the possession offense should be viewed in a vacuum as having been

10

committed on just one date, months after his manufacture of those same images, and that therefore his manufacture of CSAM on multiple occasions and his retention of those images as part of his CSAM collection are somehow not "related." *See* Defense Br. at 7-13. But the law in this Circuit is clear – possession of child pornography is a continuing offense. *See United States v. Benjamin*, 711 F.3d 371, 378 (3d Cir. 2013) ("Possession is generally understood as a course of conduct); *United States v. Yard*, 558 Fed. App'x 231, 234 (3d Cir. 2014) (Recognizing that distribution of child pornography on one date, and the defendant's "continued possession" of the same images months later caused separate harms to the victim).

Defendant instructs this Court that "relevant conduct" under USSG §1B1.3 to be considered in the application of the Section 2G2.1 enhanced Guideline includes "all acts and omissions committed …. by the defendant," and "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." But he omits subsection USSG §1B1.3(a)(3) from his definition, which directs that relevant conduct includes "all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions." The "harm" that resulted from the defendant's rape and molestation of these children and his preservation of those horrific acts through his recordings is certainly relevant conduct to his continued possession of these same recordings for more than a year, into adulthood. *See* USSG § 1B1.3(a)(3), app.note 2 ("If a defendant's accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions under which such accountability might be established.") The defendant also cites to a

11

number of decisions outside of this Circuit, none of which involved the manufacture or possession

of child pornography, and none of which are instructive to the application of the cross reference to

§ 2G2.1 for these child sex crimes.[3]

Significantly, the defendant fails to alert the Court to a case directly on point in this Circuit.

In *United States v. Castro-Valenzuela*, 304 Fed.Appx. 986 (3d Cir. 2008) the Third Circuit upheld

the application of § 2G2.1 to calculate the Guidelines based on the cross-reference in § 2G2.2(c),

where the defendant had sexually abused a 7-year old child and video recorded it, then continued

to possess the video and transported it when he traveled to the United States one month later.

Discussing the reasons that warranted the cross-reference to the more severe manufacturing

Guideline in § 2G2.1, the Third Circuit explained that "the cross-reference merely implements the

idea that a receiver or possessor who manufactured the pornography in his possession is more

culpable and more dangerous than one who received or possessed the pornography and no

more…..[t]he cross-reference serves to 'merely to distinguish [Castro–Valenzuela] from the

---

3 Each of the cases cited by the defendant are outside of the Third Circuit and are easily distinguishable from the case before this Court. In *United States v. Williams,* 693 F.3d 1067 (9th Cir. 2012), the 9th Circuit found that the defendant's bombing of his own mailbox months prior to an extortion email he later sent to others was not relevant conduct to the extortion offense. In *United States v. McCants*, 554 F.3d 155 (D.C. Cir. 2009), the Court found that the defendant's possession of false document-making equipment was not shown to be relevant to his conviction for bank fraud. And in *United States v. Ewing*, 632 F.3d 412 (8th Cir. 2011), the Court rejected the notion that the "opportunistic" (and unplanned) theft of a car during the first robbery that was then used in the commission of a second robbery was relevant conduct on the second robbery – especially where the Guidelines specifically instruct that such robberies are to be grouped separately. The criminal conduct at issue in this case is wholly different – the defendant in this case sexually assaulted his child victims on numerous occasions, and video recorded his assaults. He then saved those recordings to at least two different cell phones and uploaded at least one recording into his iCloud storage account. The acts of making video recordings, the saving of those video recordings in different locations, the addition to his CSAM collection through the manufacture and saving of additional video recordings, and his continued and uninterrupted retention of the video recordings all demonstrate that all of his criminal acts are interrelated and relevant conduct. The "harm" that resulted from the defendant's manufacture of CSAM is clearly relevant to his retention and possession of these same recordings in the months after he recorded them. *See* USSG § 1B1.3(a)(3) and app. note 2.

defendant who did not personally exploit minors to create the pornography found in his possession.'" *Id.* at 992.

Other circuit courts have all reached the same conclusion. *See, e.g., United States v. Zayas*, 758 F.3d 986, 988-89 (8th Cir. 2014) (use of the § 2G2.1 manufacturing guideline pursuant to the cross reference in 2G2.2(c) upheld, where defendant video recorded his rape of an 11-year-old boy eight years before he was arrested for receiving and possessing child pornography. The Court found that the defendant's receipt and possession offenses "involved" his manufacture of child pornography); *United States v. Dawn*, 129 F.3d 878, 884 (7th Cir. 1997) (Section 2G2.1 manufacturing Guideline properly applied to defendant's receipt and possession conviction, where he had sexually abused and recorded his victims years prior and then transported the videos into the United States; the Seventh Circuit noted that the term "offense" is defined broadly to include not only the offense of conviction but also all conduct deemed relevant by USSG § 1B1.3  - which included the defendant's earlier production of sexually explicit videos. "[C]ommon sense ... [indicates] that a receiver or possessor who has manufactured the pornography in his possession is both more culpable and more dangerous than one who has received or possessed the pornography and no more.")

That is exactly why the cross-reference is warranted in this case. Defendant Smith is much more culpable and dangerous than those offenders whose crimes are limited to possession of child pornography. He sexually abused and orally raped two tiny victims, manufactured videos of that abuse to preserve it for all time and then maintained the videos as part of his collection which he continued to possess for months after the abuse. His manufacture of the child pornography videos

13

was very clearly "involved" and was "in preparation for" his continued possession of those same images. There is no other reason to video record his abuse of these children unless he intended to maintain the videos as part of a collection – which he did. There were other instances of his abuse of Minor 1 which he did not record, including the assault on the child which resulted in his conviction in Philadelphia County outlined in paragraph 37 of the PSR. Thus the evidence demonstrates that the defendant chose to manufacture only certain images of his abuse – those which he planned (and did) maintain as part of his continued possession of child pornography. The cross reference to § 2G2.1 is proper, based on his continued and uninterrupted possession of the same video recordings he manufactured himself.

### c.  Defendant's Calculation of the 2G2.2 Guideline is Also Erroneous

Though Section 2G2.2 is not the proper Guideline to be used in this case because the cross-reference to Section 2G2.1 applies, if there had been no evidence of manufacture then the proper calculation under Section 2G2.2 would be as follows: Base offense level of 18 (2G2.2(a)(1)); two levels added because the images depicted prepubescent minors, clearly under the age of 12 years (2G2.2(b)(2)); four levels added because the images depicted the sexual abuse of a toddler boy (2G2.2(b)(4)); five levels added for the defendant's pattern of conduct, based on at least two separate instances of manufacture of child pornography (2G2.2(b)(5)); two levels added for the defendant's use of a computer (2G2.2(b)(6)); and five levels because his collection exceeds 600 images (2G2.2(b)(7)(D)); *see United States v. Haggerty*, 107 F.4th (3d Cir. 2024) (establishing that each second of a video depicting child pornography is deemed equivalent to 24 images). In this case, the total time of each video the defendant possessed is set forth in paragraph 13 of the

14

PSR, which well exceeds the 600-image maximum in the Guidelines when the total seconds in the videos are multiplied by 24. Thus, if Section 2G2.2 were applicable, the total offense level would be 36, decreased to 33 for his acceptance, not the offense level of 28 as argued by the defendant. *See* Def.Br. at 14.

Defendant takes exception to the 5-point enhancement that would be assessed under § 2G2.2(b)(5). That Section calls for a 5-level increase if the defendant "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." The commentary defines a "pattern of activity" as "any combination of two or more separate instances of sexual abuse or exploitation of a minor, whether or not the abuse or exploitation (a) occurred during the course of the instant offense of conviction, (b) involved the same minor, or (c) resulted in a conviction for such conduct." USSG § 2G2.2 app. note 1. There is nothing in the Guideline itself, the commentary, or applicable case law which limits the conduct that may support this enhancement to "relevant conduct" to the charged offense, as the defendant would have this Court believe. *See, e.g., United States v. Seibert*, 971 F.3d 396 (3d Cir. 2020) (application of § 2G2.2(b)(5) to the defendant's possession conviction upheld, based on the district court's finding that the defendant caused the manufacture of sexually explicit images of numerous minors in addition to the two minor victims referenced in the indictment). The application of § 2G2.2(b)(5) would be proper if the Guidelines under this Section were applicable.

15

### ii. *The Calculation of the Defendant's Prior Criminal History Score is Accurate*

The defendant next challenges the U.S. Probation Office's calculation of his criminal history score. His arguments should be denied.

#### a. *The Defendant's Confinement to a Juvenile Residential Facility Supports the Two-Point Assessment to his Criminal History*

The defendant argues that his previous sentences from his adjudication of delinquency do not constitute "confinement." He is again incorrect. Under USSG § 4A1.2(d)(2)(A) the Court is directed to add two points to the criminal history score for any "juvenile sentence to confinement of at least sixty days if the defendant was released from such confinement within five years of his commencement of the instant offense." The state court documents clearly show that the juvenile Court ordered the defendant's commitment. His objection should be denied.

The defendant's 2022 juvenile adjudication resulted in an original sentence of home confinement, which he violated and was then committed to a juvenile placement program for a total of 34 days, which he again violated and was committed for a second juvenile placement for a total of 179 days. As his sentences of confinement exceed 60 days and were within five years of his commission of his possession crime, two criminal history points are properly added. The juvenile court documents from Bucks County show that both placements were ordered by the Court, and that he was sentenced to confinement in "secure detention" at the Bucks County Youth Center. *See* Exhibits D-1 (Bucks County Disposition Order dated 2/3/2023 and directing placement in the Bucks County Youth Center - Community Service Foundation Program) and D-2 (Bucks

16

County Disposition Order dated 3/31/2023 and directing placement in the Bucks County Youth Center – Summit Academy Program).

The wording of each order includes the following:

**SECURE DETENTION OR SHELTER CARE**

The Juvenile shall be held in secure detention at Bucks County Youth Center. The Juvenile is eligible for secure detention pursuant to the following Section(s) of the Standards Governing the Use of Secure Detention Under the Juvenile Act: 206

Exhibits D-1 and D-2.

There can be no question that these court-ordered, "secure detention" placements qualify as "commitments" for the purpose of computer his criminal history pursuant to USSG § 4A1.2(d)(2)(A).[4] Case law also supports such a finding. *See, e.g., United States v. McNeal*, 175 Fed. App'x 546, 550 (3d Cir. 2006) (The defendant's commitment to a juvenile program where he was not free to leave constitutes "commitment" under USSG § 4A1.2(d)(2)(A)); *United States v. Lyons*, 204 F.App'x 136 (3d Cir. 2006) (unpublished) (the order of commitment to the Glen Mills School, which the Court found was a private residential facility designed to rehabilitate juvenile delinquents, was held to be a sentence of "confinement" under USSG § 4A1.2(d)(2)(A)); *United States v. Davis*, 929 F.2d 930, 932 (3d Cir. 1991) (juvenile sentenced to indeterminate term at Glen

---

[4] As the records from Bucks County in D-1 and D-2 show two distinct placements in secure facilities within five years of the commission of these federal crimes, there should have been one point assessed for his first placement of 34 days pursuant to USSG § 4A1.2(d)(2)(B), and two points for his second placement of 179 days pursuant to USSG § 4A1.2(d)(2)(A), for a total of 3 points in PSR paragraph 36, not 2 points. That would yield a total of 6 criminal history points instead of 5 but would still classify him in a Criminal History Category III. Thus, though it is correctly applied, the addition of this extra point for his first placement would not ultimately impact his Guideline calculation and need not be considered by the Court for this purpose.

Mills School, where he was not free to leave for more than 60 days, was sentenced to "confinement" or "imprisonment" for the purposes of § 4A1.2(d)(2)(A) and other related provisions, such as § 4A1.1(b), (d) and (e)); *Howard v. United States*, 743 F.3d 459 (6th Cir. 2014) (regardless of Court's wording in the order, both "placement" and "commitment" to a program where he is not free to leave constitutes "confinement" within the meaning of USSG § 4A1.2(d)(2)(A)); *United States v. Wilson*, 41 F.3d 1403, 1404 (10th Cir.1994) (juvenile's placement in state agency's secure facility for more than 60 days considered "confinement"); *United States v. Hanley*, 906 F.2d 1116, 1120 (6th Cir.1990) (same). This is true even if the purpose of the juvenile detention is rehabilitative rather than strictly punitive. *McNeal*, 175 Fed. App'x at 549.

Defendant takes exception to his placement at the Summit Academy, arguing that it does not qualify as a sentence of "commitment," and in support, attaches several photographs of the facility that show minors engaged in educational and social activities. *See* ECF 39-5. His argument centers on the fact that the defendant's placement there was not titled "imprisonment" and that because of the lush campus and the activities available to the juveniles committed to Summit, it somehow does not qualify as a "commitment" within the meaning of USSG § 4A1.2(d)(2)(A). But the records from Bucks County Court and Summit Academy unequivocally prove otherwise. The very first assessment of the defendant reflects that **"Isaiah was committed to the Summit Academy on 4/3/23 following his adjudication as delinquent on charges of Possession of a Controlled Substance and Drug Paraphernalia."** *See* Exhibit A at 1. The records also show that he needed a home pass to be able to leave the program, and that the program reported his progress

18

to his assigned state Probation Officer. *Id.*at 2. His documented commitment to Summit Academy as a result of his being adjudicated delinquent provides sufficient proof that he was "confined" within the meaning of USSG § 4A1.2(d)(2)(A). The enhancement to his criminal history score is proper and should stand.

>    b. *The Defendant's Adult Conviction is Properly Assessed Points Under his Criminal History Score*

The defendant objects to the three points assigned to his criminal history score for his adult convictions in Philadelphia County for involuntary deviate sexual intercourse with a child, in violation of 18 Pa.C.S. § 3123, and unlawful contact with a minor, in violation of 18 Pa.C.S. § 6318. *See* Philadelphia County Court of Common Pleas Docket No. CP-51-CR-0001503-2025. He bases his objection on the erroneous assertion that this conviction involved his manufacture of child pornography of the same child victim, and that the "production-related conduct" is already accounted for in the Guideline calculation. He is incorrect. The adult Philadelphia conviction involved the defendant's sexual assault of Minor 1 **on or about January 16, 2025 only – which he did not video record or photograph**.[5] He abused this child on many prior occasions and also

---

[5] Defendant attempts to make the argument that because the factual basis before the Court included his admission to his previous sexual abuse of this same child and Minor 2 when the defendant was a juvenile, that somehow it transforms his adult conviction for IDSI and Unlawful Contact with a Minor into a plea and conviction for every offense he committed against both children. He couldn't be more incorrect. The defendant was charged as an adult for ONE of the assaults against Minor 1 in January 2025. He was never charged with any of the sexual assaults or any of his recordings of the sexual assaults against Minor 1 when he was a juvenile. The Bill of Information clearly shows that the Philadelphia County charges were for the sexual offenses he committed **on January 16, 2025**. And his plea documents clearly show the two charges for which he was convicted, both of which were charged as occurring on January 16, 2025. *See* Exhibits E-1 and E-2. As it stands, the only way to hold him in any way responsible for those three separate assaults and recordings he committed as a juvenile and then retained as an adult is through the application of the cross section in USSG § 2G2.2(c) to the proper Guideline of USSG § 2G2.1. Otherwise, he faces no accountability whatsoever for his repeated and horrific abuse of Minor 1 for so many months in 2024.

chose to video record that abuse on prior occasions – those are the instances that were used in the calculation of his sentencing Guidelines on this case. But for this last assault of this same child, he was caught in the act of orally raping the child, which he did not record. The Philadelphia conviction is completely unaccounted for in the calculations of his offense level for these pending charges in federal court. He was an adult when he committed this most heinous crime – had he also recorded it that day, he would have been charged in federal court with manufacture of child pornography. His objection should be denied because his allegations are factually incorrect.

###### iii.      *Proper Calculation of the Sentencing Guidelines*

The proper calculation of the Guideline range, as set forth by the United States Probation Office in the PSR, is as follows:

| Count One (PSR ¶¶ 24-28) | Base offense level, USSG § 2G2.2(c) cross reference to USSG § 2G2.1 | 32 |
|---|---|---|
| | Victims both under the age of 12 years, § 2G2.1(b)(1)(A) | +4 |
| | Crimes involved defendant's commission of sexual acts, § 2G2.1(b)(2)(A) | +2 |
| | Crime involved sexual abuse of a toddler, § 2G2.2(b)(4) | +4 |
| | Victims were especially vulnerable, § 3A1.1(b)(1) | +2 |
| (PSR ¶ 31) | Adjusted Total | 44 |
| Acceptance of Responsibility (PSR ¶¶ 33-34) | USSG § 3E1.1(a), (b) | -3 |
| | | |
| **FINAL OFFENSE LEVEL** | | **41** |
| **Criminal History Category (PSR ¶ 36-40)** | **5 points/Category III** | **III** |
| **FINAL GUIDELINE RANGE (PSR ¶ 74)** | | **360 months to life imprisonment – limited to stat max of 240 months** |

## IV.    ANALYSIS

In this case, the defendant's sentencing Guideline range calls for a sentence of 360 months incarceration to life imprisonment, but because the statutory maximum is below the calculated range, the effective Guideline range is limited to 240 months' imprisonment. The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid

21

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A.    The nature and circumstances of the offenses

Child sexual exploitation crimes are undisputedly grave offenses. The 2003 PROTECT Act was, in part, a response to the prevalence of downward departures and the general inadequacy of sentences in child pornography cases. *See* H.R. Rep. No. 108-66, 108th Cong., 2nd Sess. 58-59 (2003). As the Sentencing Commission itself noted in a previous report:

> For more than 30 years, and particularly in recent years, Congress has focused attention on the scope of child pornography offenses and the severity of penalties for child pornography offenders. Through creating new offenses, enacting new mandatory minimums, increasing statutory maximums, and providing directives to the Commission, Congress has repeatedly expressed its will regarding appropriate penalties for child pornography offenders. Congress has specifically expressed an intent to raise penalties associated with certain child pornography offenses several times through directives to the Commission and statutory changes aimed at increasing the guideline penalties and reducing the incidence of downward departures for such offenses.

The Supreme Court has explained, "[c]hild pornography harms and debases the most defenseless of our citizens. Both the State and Federal Government have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet." *United States v. Williams*, 553 U.S. 285, 307 (2008). Congress, too, has explained the difficulties in successfully combating the "immense" problem of child pornography and the "rapidly-growing market" for such materials, which is fueled by new technologies that were largely unavailable when the

22

Sentencing Guidelines were first promulgated. *See S. Rep. No. 108-2 (2003).* Indeed, Congress has repeatedly expressed its dismay about the "excessive leniency" of federal sentences, *see H. Rep. No. 108-66; S. Rep. No. 104-358*, especially in light of the continuing harm caused to the children appearing in such materials, as well as the inflammatory effect it has on the "desires of child molesters, pedophiles, and child pornographers" which results in a robust and growing market for child pornography and therefore increased abuse of innocent children. *See Child Pornography Prevention Act of 1996,* Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26, 27 (1996), codified at 18 U.S.C. § 2251 note; *United States v. MacEwan*, 445 F.3d 249, 250 (3d Cir. 2006); *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998) ("[T]he victimization of the children involved does not end when the pornographer's camera is put away.").

Here, the nature and circumstances underlying the defendant's horrific crimes warrant the sentence called for by his calculated Guideline range. The videos that the defendant manufactured and then possessed, both on his phone and in his cloud storage account, depict the most egregious child sexual abuse. He repeatedly orally raped Minor 1 and molested her, and recorded zoomed in shots of the abuse of this young child. The video he recorded of Minor 2 is equally heinous. The defendant was fully grown and over 6 feet tall, and his abuse of this tiny boy is so difficult to see and to hear. The child is obviously in extreme stress, even more so because he cannot speak to tell anyone what was happening, so he was left with the only way he knew how to protest, which was to cry out making guttural sounds. None of that stopped this horrific assault. The defendant shifted positions to gain better access to the child, and adjusted the camera for better video recording – in other words, there were multiple opportunities during

23

this assault for the defendant to recognize the incredible trauma that he was subjecting this small boy to and to stop the assault, but the child's distress only seemed to fuel the defendant's sexual desire. The repeated and brutal assaults of these young children more than justifies the 20-year statutory maximum sentence. § 3553(a)(1).

So, too, does the fact that he chose the youngest and most defenseless of victims to abuse. Minor 1 was just five years old when he selected her to be his victim. The defendant preyed on this vulnerable child, who knew the defendant from the time she was born and loved and trusted him so much that she called him "brother."  He violated the relationship he developed with this child – and her family - to satisfy his own deviant sexual desires. He chose this little girl to abuse because she was so trusting and vulnerable. Indeed, he orally raped her at least twice during her sleep, and abused her while she was in the living room, on the couch, all of which he recorded and retained in his CSAM collection for months after the abuse. His choice of this child, whom he knew to be exceptionally vulnerable, further warrants a sentence at the range called for by his Guidelines. § 3553(a)(1).

Similarly, the defendant also knew Minor 2 from the time that the child was born. This boy was a three-year-old toddler, still in diapers, autistic and non-verbal. The defendant well knew of Minor 2's neurological deficits because he knew him since he was born. He was incredibly susceptible to the defendant's abuse because he was just a tiny child who had no ability whatsoever to combat the defendant's sexual assault. To the rest of the world this little boy was an innocent baby, but to this defendant he was nothing more than a sexual object. This child couldn't even speak to stop the abuse or tell anyone about it. Instead, he chose the only way he knew how to

express the trauma that had been inflicted upon him – he called out during the assault, making guttural sounds in protest (which the defendant ignored so that he could finish), and then later turned to self-harm, scratching himself and pulling out his own hair.[6] That child's trauma even invaded his sleep. His acting out was so severe and out of character that his mother sought therapy to address the behavioral issues – all of which this child first exhibited around the time that the defendant committed such unspeakable sexual abuse upon him. The defendant's choice of yet another vulnerable victim, and the resulting trauma to him and his entire family, more than justifies a sentence in his Guideline range. § 3553(a)(1).

The defendant's crimes have completely traumatized both families. *See victim impact letters in Exhibit B*. He abused Minor 1 in her own home, with her family sleeping in the same house. There is no person who can ever make this child feel safe again, and no place in her own home where she can ever get any peace. She has trouble sleeping, even to this day, and needs a light to be able to go to bed. She also has trouble sleeping alone in her own room, and seeks out her sister's room to sleep. The child's entire family has been impacted by the horror of the defendant's crimes. The child's mother details in her letter to this Court the trauma her family continues to endure since learning of the repeated sexual abuse of her daughter:

> There are no words that can fully describe the damage Isiah Smith has caused to our daughter, our family, and our lives. The crimes he committed against our six-year-old daughter stole something that can never be returned—her innocence. The pain, fear, and suffering resulting from his actions cannot be measured, and the effects will remain with us for the rest of our lives.
> ***

---

6 See attached Exhibits C-1 and 2, photographs of the child's scratches to his face and bald patches on his head from where he pulled out his own hair.

The impact of his actions extends far beyond our daughter. Every member of our family has been affected. We no longer trust family members, friends, or even those closest to us, let alone strangers. The sense of safety that every child deserves has been taken from our home.

Excerpt from letter from the mother of Minor 1, Exhibit B-1.

The defendant's crimes are exacerbated by the close relationship he shared with this family, and the extreme violation of trust. This family knew the defendant since he was 9 years old and cared for and supported him throughout his entire adolescence. He accompanied them on family vacations. He ate meals at their house regularly. He actually lived with them for approximately two years, including the time when he was abusing the victim in this case. These crimes have completely devastated this family. Every family member has been in therapy. They suffer from nightmares and were so traumatized by the memories that they had to move out of their home. They now have multiple cameras on the inside of their new home, some of which are aimed at the childrens' bedroom doors, so that their parents can monitor who goes in and out of their bedrooms at all hours of the day and night.

Minor 2 and his family have been similarly traumatized. Every aspect of their lives has been affected by the defendant's crimes. The victim continues to self-harm by scratching his face until it bleeds or pulling out his hair. He has regressed in his potty training and still wears a diaper at five years old, 18 months after the defendant last sexually assaulted him. His brothers and sisters are now fearful, depressed and angry, and all struggle from separation anxiety. The child's parents blame themselves, because they trusted and knew this defendant and allowed him

26

access to their child. His mother suffered panic attacks and has been in counseling since learning of the horrific abuse of her son. His mother describes herself as "completely broken":

> The pain, guilt, anger and sadness I carry every day is something I would not wish on anyone….Seeing what had been done to my baby has left me completely broken. Those images are burned into my mind, and they still haunt me. No mother should ever have to be shown proof that her child was violated and abused. In that moment, I felt like the ground was taken from under me. A part of me broke that day, and I have not been the same since.

Excerpt from letter from the mother of Minor 2, Exhibit B-2.

The defendant has demonstrated through his repeated and continued sexual abuse and exploitation of these children that there is no line which he will not cross. And the fact that he continued to maintain these most horrific recordings of his sexual abuse for more than a year – while he still maintained contact (and lived with) with these children and their families – further damages their sense of trust. The defendant has forever violated the innocence and trust of these young children. The defendant has more than earned the 20-year term recommended by his Guidelines for the damage his crimes have inflicted. § 3553(a)(1).

A significant sentence is also warranted by the length of time he abused these children and the length of time he amassed and maintained his collection of their images. He abused these children for over a year – the evidence shows that he sexually assaulted his three-year-old victim in December 2023 and recorded the abuse, and then abused his five-year old victim at least four times over nine months, extending to as recently as January 2025, when he was arrested after having been caught in the act of orally raping her yet again. He maintained the recordings he made of his sexual assaults for that entire 13-month period, as the videos were found on his phone

27

(notably, they had been transferred from a different phone when he upgraded to his current phone), as well as in his cloud storage account at the time of his arrest. Significantly, the evidence also demonstrates that the defendant accessed the video of his abuse of his three-year-old victim more than 10 months after he recorded it. Not only did he horribly assault and abuse these children for his own deviant sexual pleasure, but he continued and compounded the abuse by video recording it so that it was preserved for all time. His continued possession – and viewing - of his "trophy" recordings more than justifies the 240-month sentence called for by his calculated Guideline range. § 3553(a)(1). These separate and continued possession crimes against both of these young children warrant punishment separate and apart from the sentence that was imposed for his one-time charged abuse of one of his minor victims. A 240-month, consecutive sentence for his victimization of both victims is appropriate and justified.[7]

---

7 USSG § 5G1.3 addresses the consideration of concurrent or consecutive sentences when the "undischarged" sentence (here, the state sentence) arose from "relevant conduct" in the federal offense, and advises that in those situations, the federal sentence should be run concurrently. As noted above, that is NOT the situation before this Court. The state conviction arose out the defendant's oral rape of Minor 1 on one occasion in January 2025. That crime is not "relevant conduct" and in no way factored into the federal charges or the calculation of the federal Guidelines for this offense. The "relevant conduct" that was used to calculate the federal Guidelines all occurred while the defendant was a juvenile. He was not charged for those juvenile offenses (with the exception of the juvenile matter that is pending in Bucks County involving the three-year old victim). But the defendant has not been adjudicated delinquent on the Bucks County case, and the outcome is not certain. To the extent that the abuse of the three-year-old is relevant conduct to his possession conviction in federal court, the Court could certainly order that this sentence could run concurrently to the juvenile "sentence" if he is, in fact, later determined to be delinquent on that matter. But there is nothing whatsoever that could be conceived as warranting a concurrent sentence to his Philadelphia conviction, as the basis for that conviction was the defendant's fourth sexual assault of Minor 1, which he committed when he was an adult, and the only one we know of that he chose *not* to video record. That assault has no bearing at all on the possession of CSAM conviction in this case (because there was no CSAM created of that assault), except to the extent that the fact that he was caught in the act evidences his multiple acts of horrific, continued, and lengthy abuse of Minor 1. The sentence on this federal case should be run consecutively to ensure proper punishment for all of his crimes against these young victims.

B.        **The history and characteristics of the defendant**

The history and characteristics of this defendant also favor a significant sentence. Unlike most federal child pornography offenders who have no prior records at all at the time that they are sentenced, this defendant comes before the Court with a juvenile history and a very serious adult conviction that involved his hands on abuse of Minor 1. *See U.S. Sentencing Commission, Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 320* (2011), http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/M andatory_Minimum_Penalties/20111031_RtC_Mandatory_Minimum.cfm.     In    a    significant number of child sexual abuse and exploitation cases in this district, a sentence of life or life-equivalent incarceration was imposed for these first-time offenders, even when the offender had pleaded guilty, but had had molested his victims as part of his crimes. *See United States v. Perez-Rodriguez* (Cr. No. 20-328) (Wolson, J.) (120-year sentence was imposed on a first-time offender who pleaded guilty to abusing his two children over a one-week period and distributing the images over the Internet); *United States v. Zweitzig* (Crim. No. 19-311) (Beetlestone, J.) (Life-equivalent 360-month sentence imposed on 72-year-old offender, hands-on abuse of three children); *United States v. Jamieson* (Crim. No. 17-113-01) (Pratter, J.) (100-year sentence imposed on first-time offender who pleaded guilty, and who sexually abused an autistic, teenaged child over two-year period. Sentence represented "downward variance" from Guidelines of life); *United States v. Maffei* (Cr. No. 16-511) (Goldberg, J.) (90-year statutory maximum sentence imposed on first-time offender who pleaded guilty, abused 7-year old child over one week time period); *United States v. Zhinin* (Cr. 17-383) (Smith, J.) (Life imprisonment imposed on offender who traveled

and had sex with 13-year old victim on two occasions); *United States v. Krapf* (Cr. No. 14-36) (Sanchez, J.) (sentence of life imprisonment for first-time offender who pleaded guilty, Guideline range of life.  Defendant molested his victims); *United States v. Mazer* (12-546) (DuBois, J.) (sentence of 60-year statutory maximum imposed on Guidelines of life imprisonment for first time offender who pleaded guilty, offense involved hands-on abuse); *United States v. Worman* (Cr.No. 07-40) (Stengel, J.) (sentence of 120 years with Guidelines of life imprisonment equivalent, first time offender, with hands-on abuse).

Similarly, a review of just a handful of sentences imposed for the most egregious child sex crimes (manufacture of child pornography, the underlying crimes committed by defendant Smith leading to his conviction for his continued possession of these recordings), shows that the vast majority of the sentences involve decades in prison - even when a "downward variance" is granted. *See United States v. Orlando* (Crim. No. 18-505) (Beetlestone, J.) (50-year sentence imposed upon Guidelines of life for an offender who amassed collection of child pornography and also abused his two infant children on four occasions); *United States v. Perez-Colon* (Crim. No. 18-108) (Pratter, J.) (55-year sentence imposed on 22-year-old offender who sexually touched two-year old on two occasions and distributed images over Internet; downward variance from life Guidelines. Guideline calculation and sentence affirmed on March 22, 2023 in a precedential decision, 62 F.4th 805 (3d Cir. 2023); *United States v. Connor* (Cr. No. 19-57) (Sanchez, J.) (22-year-old defendant suffering from OCD and depression sentenced to 300 months' imprisonment followed by lifetime supervised release for coercing one 14-year-old victim online to produce sexually explicit images of herself and send them to him and maintaining a collection of images

of child pornography from the Internet; sentencing guidelines called for life imprisonment); *United States v. Gonzalez* (Crim. No. 18-305) (Beetlestone, J.) (400-month upward variance imposed on a defendant who pleaded guilty to offenses that involved his sexual abuse of his 9-year old stepdaughter over a 2-year period); *United States v. Brown*, (Crim. No. 17-113-02) (Pratter, J.) (52-year sentence for 26-year offender who abused autistic, teenaged victim; downward variance from life Guidelines); *United States v. Gonzalez* (Cr. No. 14-448) (Padova, J.)(sentence of 420 months' incarceration imposed on Guidelines of 360 months to life for first time offender who abused a two-year old); *United States v. Corcoran* (Cr. No. 15-132) (Baylson, J.) (sentence of 336 months imposed on Guidelines of 292 to 365 months' imprisonment, 20-year old first time offender); *United States v. Knappenberger* (Gardner, J.) (Cr. No. 11-316) (sentence of 420 months' incarceration imposed with Guidelines of life imprisonment); *United States v. Prawdzik* (Cr. No. 07-40) (Stengel, J.) (sentence of 360 months imposed with Guidelines of 210 to 262 months, first time offender, sexually abused victims); *United States v. Jackson* (Cr. No. 07-40-03) (Stengel, J.) (sentence of 300 months imposed with Guidelines of 360 months incarceration, first time offender who pleaded guilty, no hands-on molestation by this defendant).

Although each case is obviously adjudged on its own set of facts and background, these sentences demonstrate that Courts recognize the need for the imposition of significant sentences for offenders who molest their victims and record their abuse, like the defendant in this case. Here, the defendant's Guideline calculation calls for 360 months up to lifetime imprisonment, echoing Congress' recognition of the need for severe penalties. But the defendant in this case is limited to a 20-year sentence based on the statutory maximum penalty. He seeks further mitigation of that

downgraded sentence, and additionally requests that this Court allow the sentence to run concurrently to the sentence that was imposed for his fourth documented act of sexual abuse against the same minor victim. Such a sentence would not comport with the sentences imposed for these most egregious crimes in this district, nor around the country.

*Defendant's Report of Prior Abuse*

The defendant seeks to have his sentence mitigated based, in part, on prior sexual and physical abuse he claims to have suffered as a child. In support, he submits an evaluation by Laura Cooney-Koss, a licensed clinical psychologist, dated May 27, 2026 ("Cooney-Koss Report"). At the outset, Ms. Cooney-Koss reported that the defendant detailed an "extensive" sexual abuse history, much of which he had never reported until his interview with her, despite the many opportunities to do so as part of the numerous therapeutic interventions beginning in his childhood and extending through the time when he was 17 years of age, his years of involvement in the juvenile court system, his residential placements, and his interviews by the United States Pretrial Service and United States Probation Office. *See* Cooney-Koss Report at 4, fn6. These claims cannot be confirmed at this point, but the defendant requests that the Court accept these newly-revealed allegations at face value and use them to mitigate the sentence to be imposed.

Research has shown that some sexual perpetrators have self-serving reasons to fabricate claims of childhood sexual abuse. The victim-offender cycle narrative, the idea that those who themselves were victims of sexual abuse go on to sexually abuse children, is one that has been

perpetuated in both the media and amongst lay-persons.[8] But research does not fully support the existence of such a relationship. *See* Ian Lambie et al, *Resiliency in the Victim-Offender Cycle in Male Sexual Abuse,* 14 SEX ABUSE 31, 43 (2002) ("The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend.  However, there are serious limitations to this explanation…"); Malory Plummer & Annie Cossins, *The Cycle of Abuse: When Victims Become Offenders*, 19 TRAUMA, VIOLENCE & ABUSE 286, 286 (2018) ("Various psychological theories exist in the literature to explain the behavior of men who commit child sex offences, including the belief that child sexual abuse (CSA) is a predisposing factor for the transition from victim to offender. These theories are, however, unable to explain the fact that while most victims of CSA are female, most perpetrators of CSA are male.").[9]

To commit the types of sexual crimes that the defendant is charged with in this case, he necessarily mastered the art of deception and secrecy ("….[M]ost sex offenders have made secrecy and dishonesty a part of their lifestyle. In fact, most sex offenders have deceived many people, often for many years, and few containment professionals believe that sex offenders will suddenly

---

[8] "Childhood sexual abuse has been assumed to increase the risk for sexual offending. However, despite methodological limitations of prior research, public policies and clinical practices have been based on this assumption." Cathy S. Widom & Christina Massey, *A Prospective Examination of Whether Childhood Sexual Abuse Predicts Subsequent Sexual Offending Online Only*, 169 JAMA PEDIATRICS 1 (2015), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2086458.

[9] Robust studies have found that the link between childhood sexual abuse and future offending is far from inevitable. For other studies that have found limited evidence of a "cycle" of sexual abuse from victim to offender, *See* Tracy Thomas & William Fremouw, *Moderating Varibeles of the Sexual "Victim to Offender Cycle" in Males*, 14 AGGRESSION & VIOLENT BEHAV. 382 (2009).; Daniel Salter et al., *Development of Sexually Abusive Behaviour in Seuxally Victimised Males: A Longitudinal Study*, 361 THE LANCET 471 (2003 (finding that the majority of victims do not go on to perpetuate abuse themselves); Ashley F. Jespersen et al., *Sexual Abuse History Among Adult Sex Offenders and Non-Sex Offenders: A Meta-Analysis*. 33 CHILD ABUSE & NEGLECT 179, 190 (2009) (sexual abuse history is neither a sufficient nor a necessary condition for adult sexual offending.").

begin telling the truth when they are placed under correctional supervision.")[10] Further evidence of such duplicity can be found in a 2001 study. The study found that 67% of sex offenders initially reported experiencing sexual abuse as children. But when given a polygraph test, the proportion dropped to 29 percent, suggesting that some sex offenders were dishonest in their accounts of childhood sexual abuse, possibly in an effort to rationalize their behavior or gain sympathy from others.[11] In another study of 38,000 male offenders, "contrary to findings typically reported in retrospective clinical studies, proportionally few sexual offenders (4%) had a confirmed history of sexual abuse."[12]

Overall, the literature supports that only a small portion of sexual abuse victims will go on to become offenders, and that the vast majority do not. In fact, individuals who are victims of childhood sexual abuse often demonstrate extreme resilience and hold strong empathy for those who have been sexually abused as children. So that if this Court were to believe the claims made by the defendant regarding his childhood abuse, then he more than any other knows the trauma that he would inflict upon his tiny victims through his horrific sexual assaults, and he chose to do it anyway. That speaks volumes about his total lack of empathy and should cause this Court

---

10 KIM ENGLISH ET AL., THE VALUE OF POLYGRAPH TESTING IN SEX OFFENDER MANAGEMENT 11 (2000), https://www.ojp.gov/pdffiles1/nij/grants/199673.pdf

11 Jan Hindman & James M. Peters, *Polygraph Testing Leads to Better Understanding Adult and Juvenile Sex Offenders*, 65 FEDERAL PROBATION 8 (2001).

12 Chelsea Leach, Anna Stewart & Stephen Smallbone, *Testing the Sexually Abused-Sexual Abuser Hypothesis: A Prospective Longitudinal Birth Cohort Study*, 51 CHILD ABUSE & NEGLECT 144, 144 (2016).

tremendous concern.[13] If accepted as true, the issue then becomes what to do with the adult who is now himself a horrific and predatory child sex offender.[14] Courts have repeatedly emphasized and prioritized deterrence and the protection of future victims in making these sentencing decisions.[15] These factors, coupled with the abhorrent nature of his crimes, drive the need for a consecutive sentence within his calculated Guideline range.

### *Defendant's Psychiatric Evaluation*

The defense expert diagnosed the defendant with multiple mental health conditions, including (1) Post Traumatic Stress Disorder ("PTSD"); (2) Persistent Depressive Disorder with pure dysthymic syndrome; (3) Generalized Anxiety Disorder ("GAD"); (4) Attention Deficit/Hyperactivity Disorder ("ADHD"); (5) Cannibus and Tobacco Use Disorder, mild, in remission due to being in a controlled environment; and (6) Specific Learning Disorder, with

---

13 During his interview with his psychiatric expert, the defendant advised that he lived with his "godmother" (the mother of Minor 1) for almost two years after his uncle passed away. Cooney-Koss Report at 3. He told the evaluator that he "felt close with his godmother." *Id.* It is significant, then, that this one positive adult figure in his life still did not stop him from committing these most heinous crimes involving her own child. His crimes against this child demonstrate that there is no line which this defendant will not cross, and no support system that could be put into place that would eradicate the danger that he poses to every child.

14 The Third Circuit previously upheld the District Court's refusal to mitigate a defendant's sentence based on his history of child sexual victimization. In *United States v. Yard*, 558 F. App'x 231 (3d Cir. 2014), the District Court rejected the defendant's request for a downward variance, advising that "I cannot excuse anything in the defendant's background as having any weight with me in terms of what sentence I should impose in this case. . . . I just can't excuse what the defendant said happened to him or what his thoughts were or what his challenges were." *Id.* at 237 [internal quotations omitted]. *See also United States v. Holtz*, 2008 WL 2755449 at *4 (10th Cir. 2008) (claims of prior abuse are "nothing out of the ordinary" and so the district court could properly find that evidence of it "did not justify a below-Guidelines sentence"); *United States v. Gross*, 437 F.3d 691 694 (7th Cir. 2006) (victimization may mitigate defendant's "moral[]" culpability, but the district court can sentence on other factors including "deterrence and incapacitation").

15 *See e.g., United States v. Torrence,* 725 F. App'x. 118, 121 (3d Cir. 2018) ("This is a case in which deterrence is very important. Congress has made it clear that crimes against minors are to be dealt with very severely by judges in federal court."); *United States v. Gross*, 437 F.3d 691 694 (7th Cir. 2006) (victimization may mitigate defendant's "moral[]" culpability, but the district court can sentence on other factors including "deterrence and incapacitation.").

impairment in reading and written expression (by history). *See* Cooney-Koss Report at 25. The expert also highlighted that the defendant possesses "characteristics" of Borderline Personality Disorder ("BPD"), which she defined as a "pervasive pattern of having unstable interpersonal relationships, self-image, and affects." *Id.* Though she declined to diagnose the defendant with BPD at this point, the expert recognized that he has a "significant number of untreated serious psychiatric diagnoses" that were required to be treated to avoid having him "fully develop" BPD. *Id.* This, too, should cause the Court great concern, because the defendant has demonstrated that he is not amenable to sustained and continued treatment, and should any one of these identified mental health diagnoses present an issue at any point in his life, his risk to reoffend increases.

While the expert included two self-report tests to assess the defendant's psychological and "protective" functioning, it is significant to note that not one test was conducted to assess the defendant's sexual offending behavior. Moreover, despite the clear evidence in this case that would classify this defendant as a pedophile, there is no mention whatsoever of such a diagnosis in her report[16]. Lastly, the report includes a section titled, "Analysis of Sexual Risk and Protective Factors," but does not include any testing regarding the actual risk that the defendant poses to

---

16 Pedophilia is a form of paraphilia that causes harm to others and is thus considered a paraphilic disorder. *See* Merck Manuals, Pedophilic Disorder at https://www.merckmanuals.com/professional/psychiatric-disorders/paraphilic-disorders/pedophilic-disorder, content last updated July 2023. **Pedophilic disorder is characterized by recurrent, intense sexually arousing fantasies, urges, or behaviors involving prepubescent children or young adolescents under the age of 13 years.** *Id.* All of the evidence involved in this defendant's crimes supports such a diagnosis – he molested prepubescent children over many months, video recorded his abuse, and saved the recordings as part of his collection over a year's time. The only mention of pedophilia in the report is the expert's conclusion that the defendant does not meet the criteria – without her defining what pedophilia is or the criteria that was considered. Importantly, pedophilic disorder is a chronic condition - meaning it is habitual, ongoing, and always present. *Id.* This speaks volumes and should be considered by this Court in determining the sentence. § 3553(a)(1).

reoffend. The only "test" included was the PROFESOR assessment – which the expert admits "is not intended to predict risk for sexual re-offense." Cooney-Koss Report at 23. This test only addresses treatment, and is in no way used to predict future sex offending. Indeed, the test does not take into consideration the defendant history of offending or the circumstances of his present crime. While it may be of use to determine specific treatment needs for supervised release, it is of little use to this Court in determining the sentence of incarceration that is needed to protect the public from his future offending.

C.      **The seriousness of the offense, respect for the law, and just punishment.**

A significant term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2). This defendant's crimes are among the most serious. And his choice of victims – the vulnerable, trusting young children who knew him and loved him – elevates the seriousness of his offenses. The sentence in this case must promote respect for the laws that the defendant has broken over so many months and must make him understand the impact of his crimes. This can only be done by the imposition of a significant sentence of incarceration.

D.      **Deterrence**

Both specific and general deterrence call for a significant sentence send a message that engaging in repeated sexual abuse of children will result in a significant federal prison term. A long sentence is also necessary to minimize the risk of harm to the public for when this defendant will inevitably return to society at an age where his physical functioning and predilections will still enable him to engage in continued criminal sexual behavior. Indeed, if the best predictor of sexual

recidivism is the age of the defendant (the younger upon release, the more likely to commit a new sexual crime), then the corollary is also true: The longer they remain in prison, the older they will be upon release, and thus the less likely they will be to commit a new sexual crime.

The risk the defendant poses to children is immense. There are no boundaries which he would not cross. He exploited the only children who were within in his reach. He clearly presents a danger to any child in the community to whom he may have access. The public has a right to be protected from this defendant who has demonstrated a proven and unequivocal desire to engage in sexual activity with children as young as a three-year old toddler.

To the extent that the defendant argues that a significant variance from his Guideline range of life imprisonment would be "sufficient, but not greater than necessary," the reality is that even if he were imprisoned for the next 20 years, as is called for by his Guideline range, scholarly research in this area demonstrates that sexual predators like this defendant will simply change their modus operandus:

> Generally, older sex offenders engage in more passive sexual activity as compared to their younger counterparts. For example, fondling by elderly offenders is more prevalent than intercourse. Research has shown that elder offenders are more likely to commit 'nonviolent' sexual offenses such as pedophilia or exhibitionism as opposed to 'violent' offenses such as forcible rape. Specific examples of these 'nonviolent' offenses include improperly touching an acquaintance, statutory rape, exposing of the genitals (usually to a minor), and other acts of exhibitionism.

Matt Hart, *The Geriatric Sex Offender: Senile or Pedophile?*, 32 Law & Psychol. Rev. 153 (2008).

Simply put, people are living longer, the quality of health care in the Bureau of Prisons is better than some inmates would receive outside of prison, and the sexual attraction to prepubescent children is a life-long problem that will not magically go away at a certain advanced age.

### E. Other considerations.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D). Though the defendant could benefit from education, training, and treatment, these in no way should mitigate his sentence of incarceration. He has done very little with his life and continues to show the same lack of motivation during his incarceration on these charges. He failed out of most every high school and never graduated, and still has not obtained his GED (though he's been incarcerated since January 2025). PSR ¶ 65. Education, training, and mental health treatment are all voluntary, and there is no evidence that he will actually engage in such treatment. Most importantly, his history demonstrates that treatment is simply not effective for this defendant. He's received treatment throughout most of his lifetime, and none of it deterred him from continuing to involve himself in crime. When he was court order to participate in substance abuse treatment, he admitted that he did not actually try to refrain from smoking marijuana, because "No grown man is going to tell me what I can and can't do." *See* Cooney-Koss Report at 11. He continued to smoke marijuana every day, up to a quarter ounce per day, until his arrest in 2025. Even the program that proved to be most beneficial for him – the Summit Academy, where he learned a trade, was on a work detail, and earned respectable grades – the defendant failed to follow through after discharge at the first stressor in his personal life. See Cooney-Koss

Report at 8-9. He voices the "desire" to earn his diploma while incarcerated, but has failed to do so in the 18 months he's been incarcerated. *Id.*

Every facility within the Bureau of Prisons provides some level of mental health treatment, and for sex offenders, there is specialized treatment at a number of BOP facilities, including the Sexual Offender Management Program ("SOMP") which is staffed by highly trained psychiatric professionals. If the defendant truly desires mental health treatment, he can avail himself of such treatment during the long term of imprisonment that is mandated for these most horrific child sex crimes. Here, however, there is simply no reason to vary a sentence of incarceration for a defendant who has not demonstrated true motivation to improve his life.

### F.    Restitution.

Restitution is mandatory for these crimes, in an amount of at least $3,000 per victim. 18 U.S.C. § 2259. The child victims of the defendant's hands-on offenses have not submitted claims for restitution as they are still amassing documentation of counseling and other costs incurred. Counsel will continue to discuss this issue and advise the Court of the status of any agreement prior to the sentencing hearing.

### V.    SUPERVISED RELEASE

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further,

Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a lifetime term of supervised release is warranted. This lifetime term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), and assures that the defendant continues to pursue education and vocational efforts that promote rehabilitation, § 3553(a)(2)(D).

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3, as well as additional condition that are specific to child sex offenders. Up until this last revision of the sentencing Guidelines, the United States Sentencing Commission recommended a term of lifetime supervision for these most egregious sex offenses. *See* U.S.S.G. § 5D1.2(b)(2). The recommendation was based on the recognition that recidivism rates for sex offenders do not appreciably decline as offenders age. *See* H.R. Rep. No. 107-527, at 2 (2002) (discussing the merits of a life term of supervised release for sexual offenders). Because, in sex crimes cases, there is no reason to believe that the need for supervision inherently decreases with time, Congress found lifetime supervised release to be appropriate, and

41

thus directly inserted such a recommendation into the Guidelines. *Id.* More specifically, the passage of 18 U.S.C. § 3583(k) recognized the long-standing concerns of federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders – such as those who are attracted to and victimize prepubescent children - that are not likely to disappear within a few years of release from prison. Many of these offenders need long term or lifetime monitoring and oversight. *See* H.R. Conf. Rep. No. 108-66, at 49-50 (2003), reprinted in 2003 U.S.C.C.A.N. 683, 684.

A term of supervised release for life is reasonable and appropriate in this case to achieve rehabilitative ends and to protect children from further victimization by this defendant.

## VI.    CONCLUSION

For all of the reasons outlined above, the appropriate considerations of sentencing favor the imposition of a Guideline sentence of 20 years' incarceration, to be followed by lifetime supervised release.

Respectfully submitted,

DAVID METCALF
United States Attorney


*/s Michelle Rotella*
Michelle Rotella
Assistant United States Attorney

42

## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing Government's Sentencing Memorandum and Exhibits to be served by email and through the electronic filing system upon counsel for defendant:

Sam Welch, Assistant Federal Defender
Nancy MacEoin, Assistant Federal Defender


*/s Michelle Rotella*
Michelle Rotella
Assistant United States Attorney


Date: June 25, 2026.